THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JUAN MENDIOLA, Defendant-Appellant.
First District (5th Division)   No. 85—3456

Opinion filed May 17, 1988.

MURRAY, J., specially concurring.

Michael Jay Green and John M. Cutrone, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Paula M. Carstensen, and JoAnne M. Roddy, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:

Following a jury trial, defendant, Juan Mendiola, was convicted of murder and sentenced to a prison term of 33 years. The sole issue at trial was the authenticity of the identification of the defendant as the driver of the car from which the unknown passenger shot and killed Anthony Krause. On appeal, defendant contends for reversal that the evidence failed to establish beyond a reasonable doubt that he was the offender, that prejudicial and inadmissible hearsay statements were admitted into evidence and that defendant was irreparably prejudiced by prosecutorial misconduct.

The trial evidence revealed the following: On October 19, 1984, at approximately 2:40 a.m. near West 24th and South Washtenaw Streets in Chicago, the victim, Anthony Krause, Jack Collier, Alexander Damaio and Leo Fay were walking from a block party. Krause and Collier stepped into an alley to urinate. Damaio and Fay waited a short distance from the alley. Collier noticed a car with two men inside traveling along West 25th Street. The car slowed down as it approached Fay and Damaio. When the car reached Krause and Collier it came to a complete stop. The passenger in the car leaned over the driver, pointed a rifle out the driver's window and fired a shot. The bullet hit Krause in the forehead and killed him. The car sped away.

Collier testified that he and Krause, along with Damaio and Fay, were at a block party on the night of the shooting. Collier testified that at the block party he drank beer and smoked marijuana, but that he did not use any of the THC (Tetrahydocannobinol), an illegal drug, or the other drugs that were available at the block party. Collier stated that Damaio and Fay ingested THC.

Collier testified that he, Krause, Damaio and Fay walked on 24th Street and Collier stopped in an alley to show Krause something that had been written about him on a building. Collier testified that he was leaning against a building and the victim was urinating when Collier noticed a slowly approaching car. Fay yelled, "Look out!" just as the car stopped about 15 feet away from Collier and Krause. The driver of

the car looked at Collier and Krause, then looked at the passenger, smiled and nodded yes. The driver of the car then leaned back so that the passenger could lean across him and point a rifle out the car window at Krause. Collier stated that he stepped closer to the car and noticed the trigger of the gun. Collier further testified that when he moved away from the car, the passenger fired a shot which struck Krause in the forehead. The car then sped away.

At trial, Collier made an in-court identification of the defendant Juan Mendiola as the person who was the driver of the car. Collier described the passenger, the shooter, to the jury as a blond, white male. Collier testified that he knew defendant, that the defendant was a member of a street gang which was an enemy of Collier's street gang, that he had known the defendant for five years before the shooting and that he recognized the defendant when the shooting occurred. Collier also identified a photograph of the defendant's car and testified that he recognized it as the car from which the fatal shot was fired.

Collier testified that he was questioned by the police at the hospital to which the victim was taken about the identification of the shooter and of the car in which the shooter was riding. He did not then identify either the defendant or the car. Collier testified that he lied to the police when he stated that he did not recognize either the driver of the car or the car. He asserted, however, that he then gave the police an accurate, though limited, description of the driver. Collier testified that he told the police officer who interviewed him that the driver of the car was a white Latin male with straight black hair. Collier also testified that he gave the police officer a fabricated description of the car. He told the officer, immediately after the shooting, that the car used in the killing was a red Chevrolet Chevette, a compact car. At trial, however, defendant's car was shown to be a brown Oldsmobile Ninety-eight, a full-sized car.

Collier testified that he was a member of a gang which was a rival of the gang to which defendant belonged. Collier admitted that gang members lie and knowingly and falsely accuse rival gang members of committing offenses out of revenge and to protect fellow gang members as well. Collier stated that he lied to the police officer who questioned him because he was afraid to tell the officer the truth and because his mother told him not to identify the defendant. Collier conceded, however, that he did not talk to his mother until after the police had questioned him at the scene of the shooting and at the hospital.

Nine days after the shooting, Collier viewed a lineup in which the defendant was a participant. Collier admitted that when he first

viewed this lineup he told the police that he did not recognize anyone in the lineup. Shortly after Collier had viewed this lineup, the police took Collier to an interview room where Damaio and Fay were waiting. Collier testified that Damaio told him that he, Damaio, had identified defendant in the lineup as the driver of the car from which Krause was shot. Collier testified that he thereupon left the interview room and went to tell the police officers that defendant was the driver of the car. Collier stated that he identified the only person in the lineup who was referred to by the nickname "Ricco" in the interview room. Detective Lahm, who conducted the lineup, testified that when Collier came out of the interview room he identified the driver of the car as "Ricco."

Collier denied that he told an acquaintance, Jessie Rosardo, that when Krause was shot he, Collier, was urinating in the alley and that only when he heard the rifle shot did he exit the alley and find Krause lying on the ground. When Rosardo testified later as a State's witness, however, he related that Collier had made these statements to him.

Alexander Damaio, a witness for the State, testified that immediately prior to the shooting he stopped to converse with Fay while Collier and Krause went into the alley to urinate. Fay had his back to the wall, and Damaio, who was facing Fay, had his back to the street. Fay warned Damaio to look out for an approaching car. Damaio turned around, looked at the car for a second or a half second, and then turned away, according to Damaio's testimony.

Later, Damaio testified, he was shown the defendant's family car in the auto pound. Damaio testified that he could not tell the make of the car. Damaio said that he told the police that from a side view of the car he thought it was the car used in the shooting, but that he could not be positive. He testified that he remembered only that the car was big and dark and had opera lights.

Damaio testified that even though it was after midnight when the shooting occurred he was wearing sunglasses. He further stated that he smoked marijuana, drank beer and snorted THC through his nose at the block party. Damaio testified that his vision was distorted because he had used drugs. At the time of the trial, Damaio was on probation for possession of a controlled substance.

Leo Fay testified on behalf of the State. Fay testified that the car involved in the shooting was a large, copper-colored car with a beige top, resembling either a Buick Electra 225 or an Oldsmobile Ninety-eight, and. that he gave the police this description. (Police officers Patrick Gordon and James Gruber both later testified that Fay did not give them this description. In fact, Gruber testified that Fay described

the car as being similar to a Plymouth. Officer Gordon described the car which was registered to defendant and his brother Jesus as an Oldsmobile Ninety-eight, with opera lights and a broken taillight.) Fay testified that when he saw the car speeding away on the night of the shooting he did not notice any of these details. Fay was shown a photograph of the Mendiola car and testified that he did not see the opera lights on the car used in the shooting. Fay stated, "I wasn't paying attention to it." A few days after the shooting, Fay testified, the police showed Fay two different cars with various ornaments. Fay did not identify either of these two cars as the one used in the shooting. Fay testified that he was then shown the Mendiola car and he identified it as the car used in the shooting.

Fay further testified that he used heroin, cocaine and amphetamines, and at the time of the shooting he had had amphetamines and some beers. Fay was in prison and was enrolled in the prison's drug rehabilitation program at the time of the trial. Fay also testified that he was a former member of the Disciples street gang.

Officer Thomas Lahm testified that he was assigned to investigate the fatal shooting of Krause. Six days after Krause was shot, Officer Lahm and two other officers located what they believed was the car used in the shooting. They had the car towed to the police garage. Later that day, defendant's brother, Jesus Mendiola, went to the police station and inquired as to why his car had been towed. Shortly thereafter, Officer Lahm testified, defendant, Juan Mendiola, joined his brother Jesus at the police station, claimed that he also owned the car, and asked why it had been towed. Officer Lahm explained to the defendant and his brother Jesus that the car had been identified as the car used in the commission of a homicide. Both men were then placed under arrest.

Officer Lahm testified that two days later, defendant and Jesus Mendiola were placed in a lineup which was viewed by Collier. Collier told Officer Lahm that he did not recognize anyone in the lineup. Collier was then placed in an interview room with Damaio and Fay. Then, Officer Lahm testified, several minutes later, Collier left the interview room and told the police that he had lied and that he recognized "Ricco" Mendiola, defendant, in the lineup as the driver of the car used in the shooting.

Four alibi witnesses testified on behalf of the defendant. Maria Garcia testified that she went to the Mendiola home on the evening of October 18, 1984. Defendant was at home with Maria Medina, defendant's girlfriend; Guadalupe Rico, defendant's mother; and Victoria Mendiola, defendant's sister. Maria Garcia testified that she and Victo-

ria Mendiola went out for the evening, and when they returned to the defendant's home at approximately 2 o'clock on the morning of October 19, 1984, the defendant, Juan Mendiola, was there watching television. Maria Garcia related that she, Victoria Mendiola and the defendant remained at the house together until Garcia left at 3:15 a.m. Victoria Mendiola's testimony corroborated Maria Garcia's testimony in every particular.

Maria Medina testified that on the night of the shooting she was living with the defendant, who is the father of her children. Medina testified that after Maria Garcia and Victoria Mendiola went out, she remained with defendant and watched television until 10:30 or 11 p.m., when she went to bed. Maria Medina testified that when she awoke, she found the defendant asleep in the living room.

Guadalupe Rico testified that she was at home with defendant, Maria Garcia, Maria Medina, and Victoria Mendiola on the night of the shooting. She testified that when she went to bed at 10:30 or 11 p.m., defendant was there. Rico did not know if defendant was at home the next morning when she awoke.

■■■ On appeal, defendant first contends that the identification testimony of Collier failed to establish beyond a reasonable doubt the identity of defendant as the driver of the car. Defendant also maintains that the evidence likewise failed to establish that it was his car that was used in the shooting. It is the function of the trier of fact to determine the credibility of the witnesses. (*People v. Akis* (1976), 63 Ill. 2d 296, 298.) Moreover, a court of review will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of defendant's guilt. (*People v. Green* (1982), 104 Ill. App. 3d 278, 284, 432 N.E.2d 937.) Factors which may be considered in evaluating identification testimony include the opportunity of the witness to view the offender at the time of the crime, the witness' degree of attention, the accuracy of the prior description of the offender, the level of certainty demonstrated by the witness at the time of the identification confrontation, and the length of time between the crime and the identification confrontation. (*People v. Green* (1982), 104 Ill. App. 3d 278, 284, 432 N.E.2d 937.) While the evidence in this case is close, it is sufficient, if believed, for the jury to make a *de jure* determination of defendant's guilt. A court of review will not substitute its judgment for that of the trier of fact where the evidence is merely conflicting. (*People v. Akis* (1976), 63 Ill. 2d 296, 298-99.) We decline, therefore, to disturb the jury's verdict on the basis of reasonable doubt.

Defendant next contends that there were several evidentiary rul-

ings which extremely prejudiced defendant and that the jury's verdict of guilty should therefore be reversed. Specifically, defendant cites as error the introduction of inadmissible, prejudicial hearsay statements made by defendant's brother Jesus to the police. These statements, defendant contends, tended to exculpate Jesus Mendiola, while inculpating defendant in the commission of the shooting.

The prosecutor cross-examined defendant's sister, Victoria Mendiola, who testified that defendant was at home at the time of the shooting. Jesus Mendiola, defendant's brother, was not mentioned by any of the witnesses as having been at the Mendiola home at that time. However, the prosecutor cross-examined Victoria Mendiola about what occurred when Jesus Mendiola returned home after talking with the police at the police station:

"Q. Did Jesus tell you that Jesus told the police that Jesus was at home with his family [at the time of the shooting]?"

The defense's objection to this question was overruled after a sidebar discussion, and the prosecutor's questioning continued:

"Q. Did Jesus tell you that Jesus told the police that Jesus was at home with his family? Did he tell you that?

A. No, he didn't.

Q. Did Jesus tell you that he told the police, meaning that Jesus told the police, that Juan [defendant] arrived home at 2:50 a.m. [after the shooting] on the morning of the 19th after being out all day long? Did Jesus tell you that?

A. No, he didn't.

\* \* \*

Q. So the police were just trying to get Jesus to blame it on Juan; is that correct?

A. (No response.)

Q. And he did, didn't he. He told you that he said that Juan wasn't home; right?

A. Right. He didn't tell me that.

\* \* \*

Q. How did Jesus tell you what went on at the police station concerning himself, Jesus?

A. He told me something, yes.

Q. What were the things that he told you?

A. He told me that they were beating him up. \*\*\* They were beating him up trying to get him to answer—

Q. The police were beating up Jesus; is that right?

A. That is right.

Q. And what did he tell you about? Did he answer?

A. They were just trying to get him to blame it on my other brother.

Q. So the police were just trying to get Jesus to blame it on Juan; is that correct?

A. (No Response.)

Q. And he did, didn't he? He told you he said Juan wasn't home; right?

A. Right. He didn't tell me that."

Thus, Victoria Mendiola agreed to the prosecutor's repeated questions that Jesus Mendiola told her that he, Jesus, told the police that Juan Mendiola was not at home at the time of the shooting. Thus, the jury was improperly allowed to infer from this line of questioning and answers that the police gave the prosecutor details of a conversation between Jesus Mendiola and the police in which Jesus purportedly told the police that Juan Mendiola was not at home when Krause was shot, contrary to the in-court, sworn testimony of defendant's alibi witnesses.

■ The trial court overruled defense counsel's objections to this line of questioning and, accepting the prosecutor's argument that the statements were being offered, not for their truth, but to establish bias on the part of Victoria Mendiola and her motive to testify falsely as an alibi witness for her brother, defendant, allowed the admission of Jesus Mendiola's hearsay statements. Victoria Mendiola testified that she was defendant's sister and that they lived together in the same house. The State has failed to demonstrate to us how the out-of-court statements of Jesus Mendiola of his purported conversation with the police officers established Victoria Mendiola's bias as defendant's sister, or a motive for her to testify falsely. Equally important, the trial court did not supplement its overruling of defense counsel's objections to the admission of Jesus' hearsay statements with an instruction to the jury that the statements were being offered, and were to be considered by them, for the limited purpose of discrediting Victoria Mendiola, not for their truth. (See *People v. Taylor* (1978), 66 Ill. App. 3d 907, 384 N.E.2d 558.) The jury was free to conclude from the prosecutor's questioning of Victoria Mendiola that, contrary to her testimony and that of the three other alibi witnesses, her brother Jesus told the police that he, Jesus, was at home at the time of the offense, and that her other brother, defendant, Juan Mendiola, arrived home shortly after the shooting. Thus, the impact of the admission of Jesus' inadmissible out-of-court statements was not to demonstrate any bias of Victoria, but to convince the jury that Jesus was at home at the time of the shooting and that defendant, Juan Mendiola, was

not at home at the time of the shooting. Additionally, the inadmissible, prejudicial hearsay statements of Jesus Mendiola had the added improper effect of discrediting the testimony of all of defendant's alibi witnesses.

The court in *People v. Trotter* (1975), 27 Ill. App. 3d 136, 139, 326 N.E.2d 524, held it reversible error to admit testimony from a police officer that the defendant's neighbor had told the police officer that the defendant was not at home on the date that the victim was murdered. The court in *Trotter* stated:

> "The court, in ruling on the objection to Officer Sanford's testimony, stated that the testimony would be admitted only to show that Mrs. Johnson [defendant's neighbor] saw neither the defendant nor his friend after December 23. Despite the restriction the court placed on the effect of this testimony, it was hearsay. Since Mrs. Johnson was not called as a witness, the defendant had no opportunity to cross-examine her on what she might have observed." *People v. Trotter* (1975), 27 Ill. App. 3d 136, 139, 326 N.E.2d 524.

Likewise, in the pending case, since the out-of-court declarant, Jesus Mendiola, was not called as a witness, defendant had no opportunity to cross-examine him on his statements allegedly made to the police regarding defendant, or for that matter, whether he indeed made any such statements to the police. Moreover, the error is even more egregious than in *Trotter* because the defendant in that case at least had the benefit of a limiting instruction, whereas here the defendant did not. Here, defendant's brother was made by the State to be an unsworn witness against him. The self-serving alleged statements of Jesus Mendiola were admitted without being subjected to cross-examination, the tried and true test of credibility.

■ Defendant further contends that the trial court erred in allowing the State to introduce inadmissible evidence of the defendant's commission of other offenses with which the defendant had been charged. Evidence of other crimes is objectionable, not because it has no appreciable probative value, but because it has too much. The law distrusts the inference that because a person committed other crimes he is more likely to have committed the current one for which he is on trial. Thus, where the evidence has no value beyond that inference, it is excluded. *People v. Lehman* (1955), 5 Ill. 2d 337, 342.

■ ■ During the cross-examination of Victoria Mendiola, the prosecutor sought to elicit that Victoria Mendiola had previously testified as defendant's alibi in another case, in which defendant was acquitted. Prior to Victoria Mendiola's taking the witness stand, the

prosecutor indicated that he wished to question her about prior alibi testimony which she had given on defendant's behalf. Defense counsel objected on the ground that such testimony would inform the jury that defendant had an arrest record. The prosecutor again maintained that the evidence would prove the bias of Victoria Mendiola. The trial court ruled that Victoria Mendiola could be cross-examined on her having previously testified on defendant's behalf, but that the prosecutor could not refer to her previous testimony as alibi testimony. It is beyond argument that a witness may be questioned to show bias or prejudice for or against a litigant. However, such questioning must be relevant to that issue. (See *People v. Monroe* (1977), 66 Ill. 2d 317.) The fact that Victoria Mendiola previously testified on behalf of her brother does not necessarily establish a bias or a motive to fabricate on defendant's behalf. The probative value of such testimony is greatly outweighed by the prejudicial effect of suggesting to the jury that defendant was previously charged with some criminal offense. Having already questioned Victoria Mendiola regarding Jesus Mendiola's alleged conversation with the police under the pretext of establishing her bias and motive to testify falsely, the prosecutor completely ignored the trial court's admonishment to him not to inform the jury that Victoria Mendiola had testified for defendant as an alibi witness. The prosecutor asked Victoria Mendiola a series of questions patently intended to so inform the jury:

"Q. Okay, now this isn't the first time you've come to court to testify for Juan, is it?

Mr. Vasquez: Objection, your honor.

THE COURT: Overruled.

A. No, it isn't.

Q. And when was the first time, do you recall?

A. The first time?

Q. Yes.

A. The only time—

Q. Pardon me?

A. There was only one time.

Q. And you came to court, didn't you?

A. Yes, I did.

Q. And you were going to be a witness for Juan, weren't you?

Mr. Vasquez: Objection.

THE COURT: Overruled.

A. Yes.

Q. And you weren't to be an eyewitness, were you?

Mr. Vasquez: Objection, your honor.

THE COURT: Overruled.

A. An eyewitness?

\* \* \*

Q. Right?

A. Well, the incident never happened.

Q. So, you were not an eyewitness? You were not there at the time it was supposed to have happened, were you?

A. I don't understand.

Q. Okay. The time that you were going to come to court to testify, not this time, but before, there was another incident. You were not at the location of that incident to actually see what happened were you?

A. No, I wasn't.

Q. And you were not there to be a character witness, were you?

\* \* \*

[Objection sustained]."

We conclude that not only was the evidence of Victoria Mendiola's previous testimony irrelevant and inadmissible, but the aforesaid questioning by the prosecutor was a flagrant violation of the trial court's ruling and highly prejudicial to the defendant before the jury. The defendant is entitled to a new trial, free of prosecutorial disregard of the trial court's ruling. The judgment is reversed and the cause remanded for a new trial.

Reversed and remanded.

LORENZ, P.J., concurs.

JUSTICE MURRAY, specially concurring:

I agree with the result, but not all of the reasoning. Particularly I do not agree with the charges of prosecutorial misconduct. Just because a prosecutor is overly zealous or commits an evidentiary error does not make him guilty of misconduct. If every trial attorney who has misused the exception to the hearsay rule that permits such testimony in "not for the truth of the matter asserted" were guilty of misconduct, we would have the attorneys' discipline agency with a backlog of cases involving every distinguished trial attorney in town. From this record, I think the involved prosecutor did an excellent job in obtaining a conviction in a gang-related case, that, at best, was a very weak one.